# Implementation of International Civil Aviation Agreements

If a valid reciprocal arrangement has been entered into between the United States and a foreign country, the Civil Aeronautics Authority is authorized under existing law to grant to a foreign aircraft a permit to fly across the United States without landing or a permit to land for non-traffic purposes.

February 6, 1945

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL[*]

The State Department has requested the informal advice of the Attorney General on a question that has arisen in connection with the International Air Services Transit Agreement, commonly called the "Two Freedoms Agreement," and the International Air Transport Agreement, frequently referred to as the "Five Freedoms Agreement," drawn up at the International Civil Aviation Conference held in Chicago in the fall of 1944. These agreements grant to the signatory powers certain privileges with respect to "scheduled international air services." It is in connection with these privileges that the following question has risen: Assuming that reciprocal rights have been granted by some valid arrangement between the United States and a foreign country, is the Civil Aeronautics Authority authorized under existing law to grant to aircraft of the foreign country a license or certificate (1) to fly across United States territory without landing; and (2) to land in the United States for non-traffic purposes (e.g., refueling)?

The State Department has not asked this Department to examine the details of these agreements, or to comment on the Convention on Civil Aviation or the Interim Agreement on Civil Aviation drawn up at Chicago. The State Department has not asked us to consider whether the agreements require ratification by the Senate or may be executed as executive agreements. The only question that has been put to us relates to the construction of the statutes regulating civil aviation and we shall confine the discussion in this memorandum to that point. The question of statutory construction, however, does have a bearing on the question whether the agreements may properly be executed as executive agreements for the following reason: If the agreements required or contemplated action by the Civil Aeronautics Authority or any other agency of the government that was unauthor-

___

[*] Editor's Note: The cover memorandum attached to this memorandum opinion states that "Mr. Acheson [presumably Dean Acheson, then Assistant Secretary of State, later Secretary of State under President Truman] is very eager to get our views on this; he has called me twice in the past week. It may be that you will wish to submit a copy of my memorandum to Mr. Acheson for his comments before you decide whether you agree with the conclusion reached in the memorandum." The cover memorandum states further: "The State Department has not asked us for a formal opinion, and you will recall that in his conference with us Mr. Acheson said he was not sure that the State Department would make this request."

ized or forbidden by domestic law, a serious question might arise as to whether the agreements could be consummated as executive agreements. If it is concluded that the Civil Aeronautics Authority is authorized by existing law to grant to foreign aircraft a license or certificate to fly across United States territory without landing or to land in the United States for non-traffic purposes, the problem of the agreements contemplating action not authorized by existing law does not arise.

## I. Statutes Involved

Section 6 of the Air Commerce Act of 1926, Pub. L. No. 69-254, 44 Stat. 568, 572, as amended by the Civil Aeronautics Act of 1938, Pub. L. No. 75-706, 52 Stat. 973,[1] provides in part as follows:

> (a) The United States of America is hereby declared to possess and exercise complete and exclusive national sovereignty in the air space above the United States . . . .

> (b) Foreign aircraft not a part of the armed forces of the foreign nation shall be navigated in the United States only if authorized as hereinafter in this section provided.

> (c) If a foreign nation grants a similar privilege in respect of aircraft of the United States, and/or airmen serving in connection therewith, the Civil Aeronautics Board may authorize aircraft registered under the law of the foreign nation and not a part of the armed forces thereof to be navigated in the United States. No foreign aircraft shall engage in air commerce otherwise than between any State, Territory,

---

[1] Section 1107(i) of the Civil Aeronautics Act of 1938 amended section 6 of the Air Commerce Act of 1926. Among other things, section 1107(i) struck out the last part of section 6(a) and added the last sentence of section 6(c) as quoted in the text. In its original form, section 6(c) contained the following language limiting the authority to permit foreign aircraft to be navigated in the United States: "but no foreign aircraft shall engage in interstate or intrastate air commerce." Pub. L. No. 69-254, 44 Stat. at 572.

The Air Commerce Act of 1926 contains the following definitions:

> That as used in this Act, the term "air commerce" means transportation in whole or in part by aircraft of persons or property for hire, navigation of aircraft in furtherance of a business, or navigation of aircraft from one place to another for operation in the conduct of a business. As used in this Act, the term "interstate or foreign air commerce" means air commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, but through the airspace over any place outside thereof; or wholly within the airspace over any Territory or possession or the District of Columbia.

Pub. L. No. 69-254, § 1, 44 Stat. at 568, *codified at* 49 U.S.C. § 171 (1940).

As defined in the 1926 statute, the term "United States" includes the overlying airspace. *Id.* § 9(b), 44 Stat. at 573, *codified at* 49 U.S.C. § 179(b) (1940).

> or possession of the United States (including the Philippine Islands) or the District of Columbia, and a foreign country.

49 U.S.C. § 176 (1940).[2]

Section 1 of the Civil Aeronautics Act of 1938 contains the following definitions:

> (3) "Air commerce" means interstate, overseas, or foreign air commerce or the transportation of mail by aircraft or any operation or navigation of aircraft within the limits of any civil airway or any operation or navigation of aircraft which directly affects, or which may endanger safety in, interstate, overseas, or foreign air commerce.
>
> . . . .
>
> (16) "Civil airway" means a path through the navigable air space of the United States, identified by an area on the surface of the earth, designated or approved by the Administrator as suitable for interstate, overseas, or foreign air commerce.
>
> . . . .
>
> (25) "Navigation of aircraft" or "navigate aircraft" includes the piloting of aircraft.
>
> . . . .
>
> (31) "United States" means the several States, the District of Columbia, and the several Territories and possessions of the United States, including the Territorial waters and the overlying air space thereof.

Pub. L. No. 75-706, 52 Stat. at 977–80, *codified at* 49 U.S.C. § 401 (1940).

---

[2] The authority conferred by this section was originally vested in the Secretary of Commerce. Pub. L. No. 69-254, § 6(c), 44 Stat. at 572. As amended by the Civil Aeronautics Act of 1938, § 1107(i)(1), 52 Stat. at 1028, subsection (c) referred to the Civil Aeronautics Authority. Section 7(b) of Reorganization Plan 4 changed the title of the Civil Aeronautics Authority to "Civil Aeronautics Board" and made other changes not relevant here. 5 Fed. Reg. 2421, 2422 (June 29, 1940). The term "Civil Aeronautics Authority" is now used to refer to the Civil Aeronautics Board and the Administrator of Civil Aeronautics considered together. In this memorandum we shall use the title "Civil Aeronautics Authority" without discussing whether the authority given by section 6(c) of the Air Commerce Act may be exercised by the Civil Aeronautics Board or by the Administrator or by both. *See Permits for Flight of Foreign Aircraft into the United States*, 40 Op. Att'y Gen. 136 (Sept. 12, 1941).

## II. Text

In section 6 of the Air Commerce Act, the Congress asserted sovereignty over the airspace above the territory of the United States and reserved to American aircraft all rights of "cabotage" (e.g, air traffic between points within a single state, between two states or between the United States and any of its possessions or territories). The section, however, authorizes the Civil Aeronautics Authority to grant certain flight privileges to foreign aircraft. The only question discussed in this memorandum is whether foreign aircraft may be authorized to make non-stop flights over the United States or to land for non-traffic purposes in the United States. In neither case would the foreign aircraft be authorized to pick up passengers or freight at any point in the United States, its territories or possessions destined for any other point in the United States, its territories or possessions.

The first sentence of section 6(c) authorizes the Civil Aeronautics Authority to permit foreign aircraft "to be navigated in the United States." In its ordinary meaning and as defined in the act, "navigation" includes any flight by aircraft whether or not a landing is made; both non-stop flight and transit flight with the privilege of landing for non-commercial purposes necessarily involve the navigation of aircraft in the airspace over the United States. Therefore, if the first sentence of section 6(c) stood alone, it would authorize the Civil Aeronautics Authority to grant a permit for the type of flight discussed in this memorandum. It is necessary, however, to consider the limitation placed on this sentence by the second sentence of section 6(c).

That sentence provides that foreign aircraft may not engage in "air commerce otherwise than between any State, Territory or possession of the United States (including the Philippine Islands) or the District of Columbia, and a foreign country." For the purpose of deciding how this sentence should be interpreted we shall first consider the meaning of the term "air commerce" and then discuss the requirement that air commerce must be between a state, territory or possession of the United States, or the District of Columbia, and a foreign country.

As defined in section 1(3) of the Civil Aeronautics Act, the term "air commerce" includes any navigation of aircraft within the limits of a civil airway or any navigation of aircraft which may endanger the safety of operations in air commerce. Under this definition any flight by aircraft into the airspace of the United States would appear to be "air commerce." Both non-stop flights and transit flights with non-traffic landing privileges are, therefore, "air commerce" within this definition.[3]

---

[3] If section 6(c) is examined in the light of the definition of "air commerce" contained in the 1926 statute, it is none the less clear that under section 6(c) the Civil Aeronautics Authority may authorize non-stop flight by foreign aircraft as part of a scheduled international air service. As defined in the 1926 statute, "air commerce" includes the navigation of aircraft in the furtherance of a business. 49

If a foreign aircraft en route from one foreign point to another stops at some point in the United States or one of its possessions for a non-traffic purpose, it seems clear that the aircraft is engaged in air commerce between a "State, Territory or possession of the United States (including the Philippine Islands) or the District of Columbia, and a foreign country" within the meaning of the statute. There remains for consideration the question whether a non-stop flight by a foreign aircraft over American territory en route from a point in one foreign country to another foreign point also falls within the statutory language. When an aircraft enters the airspace over any part of the United States, including its territories and possessions, it has entered the United States as much as if it had landed within the territorial boundaries, since the United States has sovereignty over the overlying airspace. *Cf. United States v. One Pitcairn Bi-Plane*, 11 F. Supp. 24 (W.D.N.Y. 1935). For the purpose of subsection (c) it does not appear to make any difference whether the foreign aircraft returns by the same route it entered the United States. The section refers to "any" foreign country and does not require the aircraft to leave the United States by the same route it followed when entering.

Section 6(c) of the Air Commerce Act does not prohibit a foreign aircraft from entering the airspace over more than one state, territory or possession of the United States. The section refers to "any" state, territory, or possession and does not limit the application of the section to states which are on the boundary of the United States. In addition, subsection (c) refers to the District of Columbia. It would not be possible for a foreign aircraft to fly into the airspace over the District of Columbia without crossing the airspace of some other state. It is obvious, therefore, that the statute does not contemplate that the foreign aircraft is prohibited from entering any state other than a border state.

This construction of section 6(c) is reinforced by a consideration of the purposes of the Civil Aeronautics Act of 1938. Section 3 of that Act declares that the purpose of the statute is to promote the development of air transportation. If the statute were construed to prohibit the Civil Aeronautics Authority from granting a certificate to foreign aircraft for non-stop flight as part of a scheduled international air service, even though the foreign government was willing to grant reciprocal privileges, the foreign government would undoubtedly refuse such privileges to American air lines. As a result, the development of international air transport services by American carriers would be hampered rather than encouraged.

### III. Administrative Construction

Administrative practice under both the Air Commerce Act of 1926 and the Civil Aeronautics Act of 1938 supports the construction of section 6(c) outlined in

---

U.S.C. § 171. Non-stop flights or transit flights with the privileges of non-traffic landing carried on as a part of a regularly scheduled air service appear to be included within this definition of air commerce.

this memorandum. Under the 1926 statute, a number of bilateral agreements relating to air navigation were entered into between the United States and other countries granting, among other things, reciprocal privileges of non-stop flight, subject to various limitations not relevant here and to the rules and regulations of each country. *See Air Navigation Agreement*, U.S.-It., Oct. 31, 1931, E.A.S. No. 24; *Air Navigation Agreement*, U.S.-Swe., Oct. 9, 1933, E.A.S. No. 47; *Air Navigation Agreement*, U.S.-Nor., Nov. 15, 1933, E.A.S. No. 50; *Air Navigation Agreement*, U.S.-S. Afr., Sept. 20, 1933, E.A.S. No. 54; *Air Navigation Agreement*, U.S.-Den., Apr. 16, 1934, E.A.S. No. 58; *Air Navigation Agreement*, U.S.-Gr. Brit., May 5, 1935, E.A.S. No. 76; *Air Navigation Agreement*, U.S.-Ir., Dec. 4, 1937, E.A.S. No. 110.

Since 1938 bilateral agreements conferring similar privileges have been entered into. *See Air Navigation Agreement*, U.S.-Can., Aug. 1, 1938, E.A.S. No. 129; *Air Transport Services Agreement*, U.S.-Can., Aug. 18, 1939, E.A.S. No. 159; *Air Navigation Agreement*, U.S.-Fr., Aug. 15, 1939, E.A.S. No. 152; *Air Navigation Agreement*, U.S.-Liber., June 15, 1939, E.A.S. No. 166.

Since April 7, 1939 the Trans-Canada Air Lines has been operating under a permit granted by the Civil Aeronautics Authority authorizing non-stop flights by Canadian aircraft over the State of Maine en route between Toronto, Canada and Halifax, Nova Scotia. The Civil Aeronautics Authority has also issued a permit to the Canadian Colonial Airways, Inc., authorizing flights between Montreal, Canada, and Nassau in the Bahamas with a stopover for non-traffic purposes in Jacksonville, Florida.

### IV. Legislative History

The legislative history does not offer positive assurance with respect to the construction of section 6(c) of the Air Commerce Act. Non-stop flights by foreign aircraft and transit flights with the privilege of landing for non-traffic purposes were not the subject of debate in Congress at the time of the passage of the Civil Aeronautics Act of 1938. However, the agreements executed under the Air Commerce Act were not criticized or repudiated by the Congress. The legislative history indicates in this respect that the Congress intended to make no substantial change in section 6(c) of that Act.

### V. Conclusion

It is my view that the Department of State may be advised informally that if a valid reciprocal arrangement has been entered into between the United States and a foreign country, the Civil Aeronautics Authority is authorized under existing law to grant to a foreign aircraft a permit to fly across the territory of the United States without landing or a permit to land for non-traffic purposes in the United States, subject to compliance with the laws and regulations of the United States.

It is unnecessary to discuss in this memorandum whether a non-stop flight with or without the privilege of landing for technical reasons is the kind of air transportation for which a permit must be granted under section 401 or 402 of the Civil Aeronautics Act of 1938. *Cf. Canadian Colonial Airways, Inc.—Investigation*, 2 C.A.B. 752, Docket No. 601 (July 7, 1941). It is also unnecessary to discuss conditions that should be attached by the Civil Aeronautics Authority to any certificate issued to foreign aircraft.

I am attaching a memorandum prepared by Mr. Eberly discussing these questions in greater detail.

HUGH B. COX
*Assistant Solicitor General*

January 29, 1945

MEMORANDUM FOR THE ASSISTANT SOLICITOR GENERAL

This memorandum is in response to your request for my views on the questions presented in the memorandum from the Department of State for the Attorney General, dated January 8, 1945.

## I.

At the International Civil Aviation Conference held at Chicago, there were drawn up on December 7, 1944, the following multilateral agreements:

(1) a Convention on International Civil Aviation;

(2) an Interim Agreement on International Civil Aviation;

(3) an International Air Services Transit Agreement; and

(4) an International Air Transport Agreement.

Members of the Civil Aeronautics Board attended the conference as delegates of the United States. It is understood that they have approved the agreements.

The Convention is to be submitted to the Senate for ratification. The Interim Agreement provides for the establishment of a provisional organization for collaboration in the field of international civil aviation. It is to last only until the Convention comes into operation, or at most for a period of three years.

We are concerned only with the third and the fourth of these four agreements, the International Air Services Transit Agreement and the International Air Transport Agreement. These agreements deal with "scheduled international air services."

The International Air Services Transit Agreement, commonly referred to as the Two Freedoms Agreement, provides in pertinent part:

## ARTICLE I

### Section 1

Each contracting State grants to the other contracting States the following freedoms of the air in respect of scheduled international air services:

(1) The privilege to fly across its territory without landing;

(2) The privilege to land for non-traffic purposes. . . .

113

## Section 4

Each contracting State may, subject to the provisions of this Agreement,

(1) Designate the route to be followed within its territory by any international air service and the airports which any such service may use . . . .

## Section 5

Each contracting State reserves the right to withhold or revoke a certificate or permit to an air transport enterprise of another State in any case where it is not satisfied that substantial ownership and effective control are vested in nationals of a contracting State, or in case of failure of such air transport enterprise to comply with the laws of the State over which it operates, or to perform its obligations under this Agreement.

The second agreement, document 4 above mentioned, is the International Air Transport Agreement, commonly referred to as the Five Freedoms Agreement. It contains the same provisions as those quoted above from the International Air Services Transit Agreement (article I, sections 1, 5 and 6) and, in addition, three other privileges, hence giving rise to the name Five Freedoms Agreement.

Each of these two agreements comes into force as between contracting States upon its acceptance by each of them. Each agreement may be denounced by any party thereto on one year's notice.

The Two Freedoms Agreement and the Five Freedoms Agreement contain provisions making the exercise of privileges granted in the respective agreements to the contracting States subject to certain provisions of the Interim Agreement and, when it comes into force, subject to certain provisions of the Convention.

In view of the uncertainty as to the scope of the questions raised in the State Department memorandum, Mr. Barnard and I attended a meeting with representatives of the State Department on January 22, 1945. It is my understanding that with respect to the present inquiry this department is not concerned with any question arising out of the relation of the provisions of the Two Freedoms Agreement and of the Five Freedoms Agreement to the provisions of the Interim Agreement and the Convention; or with any question of national defense or security; or with the fact that the two agreements are multilateral international agreements, and not bilateral agreements; or with any question as to whether the Two Freedoms Agreement and the Five Freedoms Agreement may be executed by the President as executive agreements without the necessity of submitting the agreements, or either of them, to the Senate for its advice and consent as to ratification.

The only question on which the Department of State desires the informal opinion of the Attorney General is the question whether the two privileges granted by the Two Freedoms Agreement and the Five Freedoms Agreement with respect to foreign scheduled air services, (1) to fly across the territory of the United States without landing, and (2) to land in the United States for non-traffic purposes, are authorized by, or conform with, existing law of the United States. This question will be considered on the basis that the agreements conferring these privileges are bilateral agreements.

## II.

Both the Paris Convention of 1919 (Convention for the Regulation of Aerial Navigation, Oct. 13, 1919, 11 L.N.T.S. 173) and the Havana Convention of 1928 (Pan American Convention on Commercial Aviation, U.S.-Cuba, Feb. 20, 1928, 47 Stat. 1901) adopted the doctrine of complete and exclusive sovereignty over the air space above the territory of a state, but contained provisions extending certain reciprocal privileges to foreign aircraft within the territories of member states.

This principle of exclusive sovereignty over the air space, but with authorization for innocent passage of civil foreign aircraft under certain conditions, is written into the statutes of the United States to which reference will shortly be made.

The Paris Convention was signed by the United States, but it was not ratified. S. Doc. No. 67-348, at 3768 (1923). Ratification of the Havana Convention was advised by the Senate on February 20, 1931. 74 Cong. Rec. 5514. The Convention was ratified by the President on March 6, 1931, and proclaimed by the President on July 27, 1931. 47 Stat. 1901.

Incidentally, it may be noted that Article XV of the Paris Convention provides that every aircraft of a contracting State has the right to cross the air space of another State without landing, subject to following a designated route. S. Doc. No. 67-348, at 3775.

The Paris Convention and the Havana Convention have been interpreted to deny freedom of air navigation to the operators of air lines, except by special agreement. As a result, international services have been established pursuant to international bilateral agreements and, in some cases, by unilateral concession. The United States is a party to a number of bilateral agreements under which each party grants certain privileges to the civil aircraft of the other party.

Air navigation in the United States is regulated by the provisions of the Civil Aeronautics Act of 1938, and the Air Commerce Act of 1926 as amended by the Civil Aeronautics Act of 1938. I shall discuss first the Air Commerce Act of 1926 as originally enacted, and, secondly, the Civil Aeronautics Act of 1938.

Section 6 of the Air Commerce Act of 1926, as originally enacted, provides:

(a) *The Congress hereby declares that the Government of the United States has, to the exclusion of all foreign nations, complete sovereignty of the airspace over the lands and waters of the United States, including the Canal Zone*. Aircraft a part of the armed forces of any foreign nation shall not be navigated in the United States, including the Canal Zone, except in accordance with an authorization granted by the Secretary of State.

(b) Foreign aircraft not a part of the armed forces of the foreign nation shall be navigated in the United States only if authorized as hereinafter in this section provided; *and if so authorized, such aircraft and airmen serving in connection therewith, shall be subject to the requirements of section 3, unless exempt under subdivision (c) of this section.*

(c) If a foreign nation grants a similar privilege in respect of aircraft of the United States, and/or airmen serving in connection therewith, the *Secretary of Commerce* may authorize aircraft registered under the law of the foreign nation and not a part of the armed forces thereof to be navigated in the United States, *and may by regulation exempt such aircraft, and/or airmen serving in connection therewith, from the requirements of section 3, other than the air traffic rules; but no foreign aircraft shall engage in interstate or intrastate commerce.*

Pub. L. No. 69-254, § 6, 44 Stat. 568, 572 (emphasis supplied).

The parts underscored in the above quotation were repealed or amended by the Civil Aeronautics Act of 1938, Pub. L. No. 75-706, 52 Stat. 973.

Section 9(b) of the Air Commerce Act of 1926 provides that the term "United States," when used in a geographical sense, means the territory comprising the several States, Territories, possessions, and the District of Columbia, and the overlying air space. 44 Stat. at 573.

The term "air commerce" is defined in section 1 of the statute as "transportation in whole or in part by aircraft of persons or property for hire, navigation of aircraft in furtherance of a business, or navigation of aircraft from one place to another for operation in the conduct of a business." 44 Stat. at 568.

The term "interstate or foreign air commerce" is defined in section 1 of the statute to mean "air commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, but through the airspace of any place outside thereof; or wholly within the airspace over any Territory or possession or the District of Columbia." 44 Stat. at 568.

It will be seen that section 6 of the statute permits foreign civil aircraft, not a part of the armed forces of a foreign nation, to be "navigated in the United States" under certain conditions. The conditions are:

> (1) Reciprocal rights must first be granted by the foreign nation with respect to aircraft of the United States.

> The foreign aircraft or carrier—

> (2) must receive authorization from the Secretary of Commerce to be "navigate[d] in the United States";

> (3) may be subject to regulation; and

> (4) may not engage in interstate or intrastate air commerce.

44 Stat. at 572.

Subject to the foregoing conditions, foreign civil aircraft may be "navigated in the United States." This term is not defined in the statute. Also, it is to be noted that the statute contains no express reference to non-stop flights or landing for non-traffic purposes. It seems clear that so long as a foreign aircraft does not engage in interstate or intrastate air commerce, both non-stop flights and landing for non-traffic purposes would fall within the terms "navigated in the United States" and "air commerce" as used in the Air Commerce Act of 1926.

The term "navigation in the United States" as used in the statute includes any navigation through the air space over the territory of the United States or any part thereof. *Id.* §§ 2(e), 5(e); 44 Stat. at 569, 571. This term would, therefore, include a non-stop flight across the territory of the United States and a stop or stops in the United States for non-traffic purposes.

The term "air commerce" is defined in the Act of 1926 to include "transportation in whole or in part by aircraft of persons or property for hire" and "navigation of aircraft in furtherance of a business." *Id.* § 1; 44 Stat. at 568. Navigation of a foreign aircraft on a non-stop flight across the United States or a part thereof would seem to fall within both of these definitions.

Likewise, the landing of a foreign aircraft in the United States for non-traffic purposes—refueling, for example—when done in connection with transportation by the aircraft of persons or property for hire, or in connection with navigation of the aircraft in furtherance of a business, seems clearly to fall within the meaning of the term "air commerce" as used in the statute.

I find no apparent intent either in the language of the original Air Commerce Act of 1926 or its history to limit foreign aircraft to engaging in "foreign air commerce" within any restricted definition of this term that would exclude non-stop flights. On the contrary, the foregoing analysis of the provisions of the statute shows that non-stop flights of foreign civil aircraft and landing of civil aircraft for

non-traffic purposes are within the terms of the authorization contained in the statute as originally enacted.

There seems, however, to have been some doubt as to the construction of the Air Commerce Act of 1926. Thus, in March 1938, Mr. Hester, Assistant General Counsel, Treasury Department, later Administrator of Civil Aeronautics, gave the following testimony before a subcommittee of the House Committee on Interstate and Foreign Commerce:

> While the authority of the Secretary of Commerce under that act [the Air Commerce Act of 1926] to permit the operation of foreign private aircraft in this country is clear, his authority to permit the operation of a foreign air carrier to this country is in doubt. Consequently, a provision has been inserted in the present bill providing that no foreign air carrier shall operate to the United States unless it secures from the Authority a permit to do so. The issuance of such permits would be subject to the approval of the President.

*Hearings on H.R. 9738 Before the H. Comm. on Interstate and Foreign Commerce*, 75th Cong., 3d Sess. at 41 (1938).

The Civil Aeronautics Act of 1938 created a Civil Aeronautics Authority and conferred certain powers and duties upon an Administrator. Pub. L. No. 75-706, § 201, 52 Stat. at 980-81. The title, Civil Aeronautics Authority, was changed to Civil Aeronautics Board by the provisions of the President's Reorganization Plan 4 of 1940, § 7, 5 Fed. Reg. 2421, 2421–22, and certain changes have been made in the respective duties of the Board and the Administrator. *See Permits for Flight of Foreign Aircraft into the United States*, 40 Op. Att'y Gen. 136 (1941). For present purposes it is unnecessary to distinguish whether duties are vested in the Board or in the Administrator.

Following are pertinent provisions of the Civil Aeronautics Act of 1938:

Section 2 of the statute states that in the exercise and performance of its duties the Authority shall consider the following as being in the public interest—

> (a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense; . . .

> (d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense; . . .

> (f) The encouragement and development of civil aeronautics.

52 Stat. at 980.

Section 201(b) of the statute provides that there shall be in the Authority an Administrator, 52 Stat. at 981, and section 301 empowers and directs the Administrator "to encourage and foster the development of civil aeronautics and air commerce in the United States, and abroad," 52 Stat. at 985.

Section 402 provides in part—

> (a) No foreign air carrier shall engage in foreign air transportation unless there is in force a permit issued by the Authority authorizing such carrier so to engage; . . .

> (b) The Authority is empowered to issue such a permit if it finds that such carrier is fit, willing, and able properly to perform such air transportation and to conform to the provisions of this Act and the rules, regulations, and requirements of the Authority hereunder, and that such transportation will be in the public interest.

52 Stat. at 991.

The Authority is authorized by paragraph (f) of section 402 to prescribe the duration of any permit and to attach to it such reasonable terms as, in its judgment, "the public interest may require." 52 Stat. at 992.

Paragraph (g) provides that any permit issued under section 402 may, after notice and hearing, be altered, modified, amended, suspended, canceled, or revoked by the Authority whenever it finds such action to be in the public interest. 52 Stat. at 992.

Section 801 provides that the issuance, denial, transfer, amendment, cancellation, suspension, or revocation of the terms of any foreign air carrier permit issuable under section 402 shall be subject to the approval of the President. 52 Stat. at 1014.

Section 802 provides that the Secretary of State "shall advise the Authority of, and consult with the Authority, concerning the negotiation of any agreements with foreign governments for the establishment or development of air navigation, including air routes and services." 52 Stat. at 1014.

Section 1102 provides that in exercising and performing its powers under the Act, "the Authority shall do so consistently with any obligation assumed by the United States in any treaty, convention, or agreement that may be in force between the United States and any foreign countries." 52 Stat. at 1026.

The statute gives recognition to "agreements" entered into by the United States with foreign governments "for the establishment or development of air navigation, including air routes and services."

It will be noted that under the Civil Aeronautics Act of 1938 a foreign air carrier is required to obtain from the Civil Aeronautics Board a permit to engage in foreign air transportation. The issuance of any permit is subject to the approval of

the President. It is understood that if the Two Freedoms Agreement and the Five Freedoms Agreement are entered into by the United States, foreign air carriers who wish to make non-stop flights or who want permission to land in the United States for non-traffic purposes will be required to obtain permits from the Civil Aeronautics Board in the same manner as other foreign air carriers who make stops in the United States for traffic purposes.

The Civil Aeronautics Act of 1938 (section 1107(i)(1) and (5)) amended section 6(c) of the Air Commerce Act of 1926 to read in part as follows:

> If a foreign nation grants a similar privilege in respect of aircraft of the United States, and/or airmen serving in connection therewith, the *Civil Aeronautics Authority* may authorize aircraft registered under the law of the foreign nation and not a part of the armed forces thereof to be navigated in the United States. *No foreign aircraft shall engage in air commerce otherwise than between any State, Territory, or possession of the United States (including the Philippine Islands) or the District of Columbia, and a foreign country.*

52 Stat. at 1028 (underscored portions added by the 1938 amendment).

The Civil Aeronautics Act of 1938 substituted for the provision in section 6(c) of the Air Commerce Act of 1926 that "no foreign aircraft shall engage in interstate or intrastate air commerce" the requirement that "no foreign aircraft shall engage in air commerce otherwise than between any State, Territory, or possession of the United States (including the Philippine Islands) or the District of Columbia, and a foreign country."

There is a question whether the Congress intended by this change in the provisions of the Air Commerce Act of 1926, and by the other provisions of the 1938 statute that I have mentioned, to prohibit foreign aircraft from making non-stop flights across the United States in connection with scheduled international air services. I find no such intention either in the language of the statute or in its history. Reading the provisions of section 6(c) of the Air Commerce Act of 1926, together with the provisions of the Civil Aeronautics Act of 1938, it seems to me that all that was intended was to prohibit foreign aircraft or foreign air carriers from engaging in interstate air commerce or intrastate air commerce.

Section 1 of the Civil Aeronautics Act of 1938 contains the following definitions:

> (3) "Air Commerce" means interstate, overseas, or foreign air commerce or the transportation of mail by aircraft or any operation or navigation of aircraft within the limits of any civil airway or any operation or navigation of aircraft which directly affects, or which may endanger safety in, interstate, overseas, or foreign air commerce.

. . . .

(20) "Interstate air commerce," "overseas air commerce", and "foreign air commerce," respectively, mean the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct or furtherance of a business or vocation, in commerce between, respectively—

(a) a place in any State of the United States, or the District of Columbia, and a place in any other State of the United States, or the District of Columbia; or between places in the same State of the United States through the air space over any place outside thereof; or between places in the same Territory or possession (except the Philippine Islands) of the United States, or the District of Columbia;

(b) a place in any State of the United States, or the District of Columbia, and any place in a Territory or possession of the United States; or between a place in a Territory or possession of the United States, and a place in any other Territory or possession of the United States; and

(c) a place in the United States and any place outside thereof, whether such commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

Under section 6 of the Air Commerce Act of 1926, as amended, foreign aircraft may be authorized "to be navigated in the United States." It has been shown that this term includes non-stop flights. Section 6 further provides that no foreign aircraft shall engage in "air commerce" otherwise than between any State, Territory or possession of the United States and a foreign country. The term "air commerce" as used in section 6 before it was amended by the Civil Aeronautics Act of 1938 also includes non-stop flights.

The term "air commerce" in the last sentence of section 6(c) of the 1926 Act, after the subsection was amended by the 1938 Act, is somewhat ambiguous for the reason that the definition of "air commerce" in the Act of 1938 differs from the definition of "air commerce" in the Act of 1926. The term "air commerce" as used in the 1938 Act includes any operation or navigation of aircraft which directly affects, or which may endanger safety in, interstate, overseas, or foreign air commerce. This definition, therefore, as well as the definition of "air commerce" in the 1926 Act, seems to include non-stop flights.

The Civil Aeronautics Act of 1938 is derived from S. 3845, 75th Cong., 3d Sess., and H.R. 9738, 75th Cong., 3d Sess.

S. 3845, as reported to the Senate and agreed to by the Senate, provided in section 1103:

> (b) . . . If a foreign country grants a similar privilege in respect of aircraft of the United States the Authority may authorize such foreign aircraft registered under the laws of such country to enter and be navigated within the United States. . . .

> (d) No foreign aircraft shall engage in interstate or overseas air commerce, or in the transportation of persons or property for compensation or hire, or be operated or navigated in the conduct or furtherance of a business or vocation, in commerce wholly within a State.

83 Cong. Rec. 6765 (1938).

H.R. 9738, as reported to the House and agreed to by the House, contained the amendment to section 6(c) of the Air Commerce Act of 1926, which was finally adopted in the 1938 Act, providing that no foreign aircraft shall engage in air commerce otherwise than between any state and a foreign country. 83 Cong. Rec. 7100, 7104 (1938).

The Senate bill repealed all of the provisions of the Air Commerce Act of 1926, and rewrote in the text of the bill such of the provisions that the Senate thought necessary to preserve. The House bill, on the other hand, repealed most of the 1926 Act, but preserved in existence and amended in certain respects other provisions of the 1926 Act. The conferees adopted the House amendment, dealing with "admission of foreign aircraft into the United States," without, however, indicating that in their opinion there was any material difference between the Senate provision and the House provision. Where there was any substantial or material difference between a Senate provision and a House provision, the conference report called attention to the difference. *See* H.R. Rep. No. 75-2635, at 80–81 (1938).

It thus appears that the provisions of the House bill and the Senate bill were each designed to prohibit foreign aircraft from engaging in interstate air commerce or overseas air commerce or air commerce wholly within a State. The amendment to the 1926 Act made by the 1938 Act authorizing foreign aircraft to engage in air commerce between the United States and foreign countries discloses no purpose to prohibit foreign air carriers from engaging in air commerce to the extent of making non-stop flights across territory of the United States or of landing in the United States for non-traffic purposes.

The Civil Aeronautics Act of 1938 is intended to promote the development of civil aeronautics and air commerce in the United States and abroad. The statute should be construed consistently with this purpose and its provisions. In permitting foreign aircraft to engage in air commerce between the United States and a foreign

country the Congress has disclosed no purpose to prohibit foreign aircraft from making commercial non-stop flights over the territory of the United States. Fairly construed, such non-stop flights of foreign aircraft fall within the provisions of the Air Commerce Act of 1926, as amended, and the provisions of the Civil Aeronautics Act of 1938.

A construction that would prohibit foreign aircraft from engaging in commercial non-stop flights undoubtedly would preclude the Government of the United States from obtaining similar privileges from foreign governments for American air carriers. Such a construction would hamper and restrict the development of civil aeronautics and air commerce in the United States. It would be contrary to the provisions and purpose of the Air Commerce Act of 1926, as amended, and the Civil Aeronautics Act of 1938.

## III.

The administrative practice supports the construction that I have suggested. Under the 1926 Act a number of bilateral agreements were entered into by the United States with foreign governments granting liberty of passage over our territory in time of peace, and providing for the establishment and operation of regular air routes by air transport companies "across the said territory, with or without intermediary landing, . . . subject to prior consent of the other party given on the principle of reciprocity." *Air Navigation Agreement*, U.S.-Swe., art. 4, Oct. 9, 1933, E.A.S. No. 47, at 1-2; *Air Navigation Agreement*, U.S.-Nor., art. 4, Nov. 15, 1933, E.A.S. No. 50, at 1; *Air Navigation Agreement*, U.S.-S. Afr., art. 4, Sept. 20, 1933, E.A.S. No. 54, at 1-2; *Air Navigation Agreement*, U.S.-Den., art. 4, Apr. 16, 1934, E.A.S. No. 58, at 2. *See also Air Navigation Agreement*, U.S.-It., Oct. 31, 1931, E.A.S. No. 24; *Air Navigation Agreement*, U.S.-Gr. Brit., May 5, 1935, E.A.S. No. 76; *Air Navigation Agreement*, U.S.-Ir., Dec. 4, 1937, E.A.S. No. 110.

Since 1938 additional agreements have been entered into.

An agreement between the United States and Canada grants, subject to compliance with local laws and regulations, liberty of passage in time of peace above the territories of each of the parties. It is further agreed "that the establishment and operation by an enterprise of one of the Parties of a regular air route or services to, over, or away from the territory of the other Party, with or without a stop, shall be subject to the consent of such other Party." *Air Navigation Agreement*, U.S.-Can., art. 3, Aug. 1, 1938, E.A.S. No. 129, at 1.

In a further exchange of notes, the Government of the United States and the Government of Canada agreed, subject to compliance with their laws and regulations,

> to grant to air carrier enterprises of the other Party permits for non-
> stop services through the air space over its territory between two

points within the territory of the other Party; provided however that inland non-stop services between the United States and Alaska shall be the subject of a separate understanding.

*Air Transport Services Agreement*, U.S.-Can., art. 3, Aug. 18, 1939, E.A.S. No. 159, at 1.

On July 15, 1939, the United States entered into an agreement with France by which each contracting party granted, subject to its laws and regulations, in time of peace, "liberty of passage above its territory" to the registered civil aircraft of the other party, and agreed that the establishment and operation of a regular air route or air transport service to, over or away from the territory of the other, with or without stop, should be subject to the consent of the other party. *Air Navigation Agreement*, U.S.-Fr., art. 4, Aug. 15, 1939, E.A.S. No. 152, at 2.

On June 14, 1939, the United States and Liberia entered into an agreement, effective June 15, 1939, providing that, subject to compliance with local laws and regulations, civil aircraft, not engaged in regular scheduled services, "shall be accorded liberty of passage above and of landing upon the territory of the other Party." *Air Navigation Agreement*, U.S.-Liber., art. 1(b), June 15, 1939, E.A.S. No. 166, at 3.

## IV.

Accordingly, confining the advice in the manner that I have mentioned in this memorandum, I believe that the Department of State can be advised informally that the statutes permit the Government of the United States to enter into an agreement with the government of a foreign country granting on the principle of reciprocity, in respect of scheduled international air services, the privilege to fly across the territory of the United States without landing, and the privilege to land in the United States for non-traffic purposes, subject to compliance with the laws and regulations of the United States.

W.H. EBERLY
*Attorney-Adviser*
*Office of the Assistant Solicitor General*
